JOSEPH E. GALLAGHER AND OTHERS, RESPONDENTS,
v. THE YOSEMITE MINING AND MILLING COM-
PANY, A CORPORATION, APPELLANT.[1]

1. TRUSTS.—FORECLOSURE.—INTEREST OF TRUSTEES.—Where prop-
erty is held in trust to secure the payment of certain debts,
the fact that the trustees are interested as partners in certain
of the creditor firms does not affect their right to foreclose
and sell the trust property.

2. TRUSTEES.—CONFLICT OF EVIDENCE.—FINDINGS.—Upon an issue
as to whether the removal of certain ore from a mine by trus-
tees caused special injury to the mine, where the evidence is
conflicting, several witnesses on each side giving contrary tes-
timony, the finding of the referee will not be disturbed.

3. ID.—ACCOUNTING.—LEGITIMATE CHARGES.—Though certain ex-
pensive operations, carried on by the trustees of a mine at the
request of the beneficiary, yield no profit, such expenses are
legitimate charges against the trust property.

(No. 407.   Decided June 19, 1894.   37 P. R. 264.)

APPEAL from the District Court of the Third Judicial
District, Hon. George W. Bartch, *Judge*.

Action by Joseph E. Gallagher, William H. Remington
and Geo. M. Scott against the Yosemite Mining and Mill-
ing Company. From a judgment for plaintiffs affirming
the report of D. C. Lyles, referee, defendant appeals.
*Affirmed.*   The facts are fully stated in the opinion.

*Mr. Arthur Brown, Mr. Frank Hoffman* and *Mr. M.
M. Kaighn,* for appellant.

*Mr. W. H. Dickson,* for respondents.

[1]Rehearing denied July 27, 1894.  Appealed to the supreme court
of the U. S. Sept. 29, 1894.

SMITH, J.:

This is an action by plaintiffs to enforce a certain trust agreement made between plaintiffs and defendant. The agreement is as follows (Exhibit No. 1):

"George M. Scott and William H. Remington, and each of them, agree with the Yosemite Mining and Milling Company, a corporation, as follows: They will procure the assignment and transfer to them of accounts and claims against said corporation as follows: George M. Scott & Co., $4,236.37; Remington, Johnson & Co.; $2,671; Bingham Mercantile Co., $395.52; Bingham Mercantile Co., $358.65; James Anderson, $3,640; Scott & Anderson, $72.35; W. J. McIntyre, $300,—$11,673.89. That they will accept and receive said corporation's note therefor, for $11,673.89, due October 1, 1888, with interest at 12 per cent. per annum, secured by deed of trust on its properties, the same being listed in the outstanding deed of trust to McCormick & Co. That they will bid in and purchase all of said properties at the sale under said McCormick deed of trust, in which one Josiah Barnett is trustee, for an amount not exceeding the sum of said incumbrances and claims, and hold same, first, to secure to them the repayment of the money required to cover the amount of said McCormick deed of trust and the claims and accounts hereinbefore mentioned, necessary and proper costs and expenses and interest, and afterwards in trust for the benefit of said corporation. That they will endeavor, by sale or otherwise, to realize the largest possible amount out of or on said properties, and pay the surplus received therefrom, after paying said incumbrances, costs, and interest, over to said corporation, its agent or successor. Witness the hands and seals of said parties, this 13th day of September, 1888, in the city of Salt Lake, Utah. [Signed] George M. Scott. [Seal.] [Signed] W. H. Remington. [Seal.] [Signed]

The Yosemite M. & M. Co.     [Corporate Seal], by M. M. Kaighn, its President.     Witness:     C. O. Whittemore."

This action is to foreclose the equity of the defendant, and procure a sale of the property described in it.     The complaint shows that in addition to the money to be paid to McCormick & Co., and the other claims described in the agreement, there is due the plaintiffs, for moneys laid out and expended in caring for and working the trust property, a large sum of money.     The aggregate claim of plaintiffs at the trial, after allowing all offsets, was about $60,000.     The answer denied that anything was due plaintiffs; set out at great length certain acts of mismanagement and waste on the part of plaintiffs while in possession as trustees, and that plaintiffs had sold large quantities of valuable ores from said mines, and had not accounted therefor.     The answer prayed an accounting, and that plaintiffs be charged with the damage to the property resulting from mismanagement; and that plaintiffs take nothing, and defendant recover its property free of incumbrance, and the costs of the action.     The cause was referred to a referee, who tried the same and reported findings of fact in favor of plaintiffs and against defendant; that the amount due plaintiffs from defendant, after allowing all offsets, was $55,488.98.     The court rendered judgment for this amount, and decreed a lien therefor on defendant's mining property, and directed a sale of the same to pay the judgment and costs.     A motion for a new trial was made and overruled, and defendant appeals from the judgment and order.

The appellant claims that certain credits were improperly allowed to plaintiffs, and certain others were disallowed to defendant, which, if corrected, would show that plaintiffs are in fact indebted to defendant.     The items mentioned in the brief, and for which it is claimed plaintiffs should

not have credit, are: Legal expenses, $83; witness fees, $156.50; and refund from Varian & Barnett, $450. As to these three items, it is sufficient to say they appear by the record to have been disallowed by the referee and court below, and are not included in the judgment at all. The first credit which was allowed plaintiffs which is complained of is the sum of $11,673.89, mentioned ln the trust agreement, above set out, with the interest on it. This debt, as will be seen by the trust agreement, *supra,* was evidenced by a note of October 1, 1888; and the consideration for this note was very largely debts due to George M. Scott & Co. and Remington, Johnson & Co. It was admitted on the argument that Scott and Remington, the trustees, were interested in these firms, and, further, it is not claimed that defendant has paid any of these debts. The plaintiffs are trustees holding property to secure their payment. If they have not paid them, we fail to see how the defendant can be harmed by a foreclosure and sale of the trust property, to procure funds for their payment. We think in the accounting, as against defendant and in favor of plaintiffs as trustees, this item was properly allowed.

Defendant claims the following credits, also allowed plaintiffs, are improper, and should have been disallowed, to-wit: Unnecessary expense of setting boiler, $76; repairs on burned-out boiler, $331.78; new pump, $398.90; unnecessary expense in pumping, $3,600; unnecessary expense in sinking incline, $6,000; loss in hauling and concentrating ore, $8,554.52,—total, $18,961.10. We have carefully examined the testimony as to each of these items, and are fully convinced that, as to each of them, the findings of the referee in favor of plaintiffs are fully justified by the evidence. The plaintiffs began working the mine at the written request or demand of the defendant, through its president and manager. The mine had been idle for a

considerable length of time before Scott and Remington took possession. The lower workings were filled with water, and the machinery of the concentrating mills does not appear to have been capable, for some reason, of doing efficient work in concentrating low-grade ores. Outside of the testimony of witnesses directly on the point, the previous conduct of the defendant in allowing several thousand tons of ore to lie on the dump without working, when it was so much in need of money, is well-nigh conclusive evidence that there was some practical difficulty in handling the ore with the machinery in the possession of defendant. The plaintiffs took this same ore from the dump, and, notwithstanding it is claimed they paid too much for hauling and concentrating it, they managed to get a very considerable profit out of it. If, as defendant now claims, it could have worked the ore for less expense by working it in its own mills, it is extremely difficult to conceive a reason why it did not do it. This discussion relates to the last of the above items, to-wit: "Loss in hauling and concentrating ores, $8,554.52." As to the other items, they all appear to have been necessarily incurred, and are no greater expense than might ordinarily be expected to be encountered in pumping out and trying to work a mine partly filled with water, and which had long been disused. The plaintiffs had some misfortune in the breaking of machinery and otherwise, but no more than would ordinarily be expected, and no more, apparently, than the defendant had in the work it had done on the mine. In other words, we fail to find in the evidence anything that would warrant us in the conclusion that plaintiffs, either wilfully or negligently, incurred expense in working the mine which they could reasonably have avoided.

The defendant claims that it should have been allowed

certain additional credits which were not allowed by the referee, as follows: Damage to ore bin, $750; damage to tramway, $10,000; damage to mine, $5,000,—total, $15,750. As to the first of these items, it is sufficient to say that it was allowed to defendant by the referee. The damage to the tramway is earnestly insisted upon here. The facts, as shown by the record, are that in 1886, or prior thereto, defendant had erected a wire-rope tramway, something over a mile long. After using it a few months defendant ceased to use it, and thereafter, up to the time plaintiffs took possession, in 1888, the tramway was not used. The weight of the testimony shows (although it was not without conflict) that when plaintiffs took possession, in 1888, the wire cable was down on the ground; that many of the posts or stations had been carried away, and that the buckets or carriers were detached and scattered or lost. The cable and buckets were gathered up by plaintiffs and sold, and the proceeds credited to defendant. We think the referee was right in disallowing defendant's claim for damages on this account. The value of this tramway, if repaired, was wholly problematical. The cost of repairing it must have been great. Plaintiffs had before them the experience of defendant in abandoning the tramway when it was in perfect repair, and returning to wagons as a means for transporting ore. Under such circumstances they would hardly have been warranted in expending money to set up this tramway again. Such being the case, it was clearly their duty to gather up the available material of the tramway and sell it for the best price they could obtain. This is just what they did, and we cannot find that defendant was damaged thereby.

The remaining item claimed is $5,000, damage to mine. This damage is claimed to have arisen by reason of the fact that plaintiffs took out certain ore that had been left along the sides of the incline by the previous management,

and left waste in some of the levels.    It is claimed that the ore was left for show, ventilation, and support, and that its removal injured the mine in the sum claimed.    It must be admitted, we think, that the removal of any ore from a mine is an injury to the mine, to the extent, at least, to which the removal exhausts the mine.    This is conceded by the parties here, but defendant claims that the particular ore removed was of especial value for the purposes above named,—greatly in excess of the market value of the ore.    As to whether the extraction of this ore caused any special injury to the mine is a question upon which the testimony is directly conflicting.    Palmer, Harkness, Eagan, and Treweek, all men of great experience, testify that no damage was done.    They had each made an inspection of the ground, to determine if there was any damage, just before the trial.    On the other hand, Kaighn, Frances, Harkins, Hall, and Nulhall all state that the extraction of this ore, and certain other acts complained of, caused considerable special injury to the mine.    Under such circumstances, we do not think we are warranted in disturbing the finding of the referee, which on this issue was against the defendant.

It was claimed generally at the argument that this court must set aside a judgment which in effect found that in 1888 plaintiffs took possession of an old developed mine, held it, working it most of the time, and then at the date of the judgment, December 17, 1891, secured judgment for $55,488.98 against defendant, whereas the entire claims of plaintiffs were less than $30,000 when they took possession.    We cannot reverse the judgment on such a general claim as this.    The facts and figures in the record are against the defendant.    The plaintiffs appear to have had competent men in charge, and to have done the very best that could be reasonably expected in working the mine. The loss on the mining operations appears to have been

caused by reason of pumping out the lower levels, which were flooded, and in sinking the incline, and running the levels in barren ground, all of which work was begun and carried on at the written request of the defendant, and upon defendant's assurance that rich ore bodies would be discovered by such work. The work, being below the water level, was exceedingly expensive, and, as it turned out, developed nothing of value. Plaintiffs ought not to be charged now with the money lost in these operations. Being incurred in good faith, they would, under any circumstances, be a legitimate charge against the trust property; but especially is this so when it appears, as in this case, that it was done at the instance of the only beneficiary under the trust that now complains. The judgment and order denying a new trial are affirmed.

MERRITT, C. J., and MINER, J., concur.